IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CHRISTIN DISLER,                    )

                Plaintiff           )

        v.                          )            No.  3:04-cv-191

TARGET CORPORATION and              )
TARGET STORES,
                                    )
                Defendants
                                    )

## MEMORANDUM OPINION

Plaintiff's complaint, as ultimately amended,[1] alleges that defendants,

Target Stores and Target Corporation (collectively "Target"), paid male employees

in her position a higher salary and refused to give her a raise on account of her

gender in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. §

2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the

Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, the

Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 2006, and the Tennessee Equal Pay

Act, Tenn. Code Ann. § 50-2-201, *et seq.* (both federal and state acts hereinafter

---

[1]Plaintiff filed her original complaint on April 29, 2004 [*see* Doc. 1], her first amended complaint on September 2, 2004 [*see* Doc. 11], and her second amended complaint on October 15, 2004 [*see* Doc. 14].

collectively referred to as the "EPA"). Additionally, plaintiff alleges that she was subjected to harassment (hostile work environment) on the basis of her gender in violation of Title VII and the THRA; that she was improperly classified as an exempt employee and not paid overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 2001, *et seq.*; and that she was subjected to retaliation, both by an adverse action and harassment (hostile work environment) for complaining to Target about its violation of Title VII, the THRA, the EPA, and the FLSA.[2] Finally, plaintiff alleges that she was constructively discharged as the result of the foregoing hostile work environment created by Target.

This matter is presently before the court on the following motions:

1.    Plaintiff's motion for sanctions for spoilation of evidence [Doc. 42];

2.    Plaintiff's motion for partial summary judgment [Doc. 47]; and

3.    Target's motion for summary judgment [Doc. 48].

The issues raised have been exhaustively briefed by the parties [*see* Docs. 44, 49, 50, 55, 57, 58,59, 67, and 68], and oral argument was heard on February 17, 2005,

_____

[2]Plaintiff also alleges a claim for retaliation related to her reapplication for employment with Target after she resigned; however, she now agrees that claim should be dismissed [*see* Doc. 59, p.31]. The court's order, therefore, will reflect that concession. Moreover, the facts relating to that claim will not be discussed in this opinion.

2

with respect to plaintiff's motion for sanctions for spoilation of evidence and on March 28, 2005, with respect to the parties' dispositive motions.  For the reasons that follow, plaintiff's motion for sanctions for spoilation of evidence will be granted to the extent that the court will employ some version of the "missing evidence" instruction at trial regarding the destroyed videotapes;  defendant's motion for summary judgment will be granted to the extent that all of plaintiff's causes of action except for her FLSA action will be dismissed; and plaintiff's motion for partial summary judgment will be denied as moot because, in the court's view, Target's affirmative defenses will have no impact on plaintiff's remaining claim.[3]

I.

### *Factual Background*

The facts of this case will, of course, be considered in the light most favorable to the plaintiff, Christin Disler, a white female.  Ms. Disler began working for Target on November 29, 1999, in Richmond, Virginia.  Prior to that time, Ms. Disler had worked intermittently in retail for thirteen years.  During seven of those years, Ms. Disler had never managed more than five or six people;  however, for the remaining six years, she managed over thirty employees.

---

[3]The court will allow further argument on this issue prior to trial, however.

After being hired by Target, Ms. Disler attended its business college for two months and then went to work in Rocky Mount, North Carolina, as an Executive Team Leader - Logistics ("ETL-Logistics") in an intern capacity for another month and a half. According to her wage history chart, Ms. Disler's initial annual salary was $54,000 [*see* Doc. 58, Ex. 28 (filed under seal)].

On March 12, 2000, Target placed Ms. Disler in Roanoke, Virginia, in the same position of ETL-Logistics. In the Target hierarchy, the ETL-Logistics (or, for that matter, any ETL) reports directly to the Store Team Leader ("STL"), who is the store manager, a salaried supervisory position. The STLs in turn report to the District Team Leader ("DTL"), also a salaried supervisory position. The average district for a DTL is between six and eleven stores.

Ms. Disler held her position as the ETL-Logistics for only six months because she developed "Wharton's neuroma, and ... couldn't be on [her] feet for the length of time that [she] needed to be ... [and] [t]here were times that [she] was actually in a wheelchair ... [until she had] surgery." [*See* Doc. 58, App., Ex. 9, p.87].[4] In response, Target moved her into the position of ETL-Guest Services,

---

[4]Ms. Disler also testifies that she did have "some difficulties with specific team members" in her position as ETL-Logistics [*see* Doc. 48, Ex. A, p.88]. For example, her team leader, a male, commented "about [her] breasts" and was generally not supportive of her in that position [*id.* at 88-89]. Target, however, was responsive to her complaints and to those of other team members and terminated that employee [*id.* at 89].

4

which was less strenuous and accommodated Ms. Disler's limitations regarding her mobility. Yet, Ms. Disler's salary and benefits remained the same after the transfer.[5] During the time that she was employed as an ETL-Logistics, Ms. Disler was selected by Target to participate in a series of interviews designed to identify individuals to be promoted to STLs. Ms. Disler agreed with the statement that she was "signed off as an STL" which means that Target "consider[s] you to be qualified as an eligible candidate for that position." [Doc. 58, App., Ex. 9, p.95]. However, Ms. Disler was quick to point out that Target made "[n]o promises ... as to the date or time" of any such promotion to STL [id.].

Ms. Disler served in her capacity as ETL-Guest Services in Roanoke from September 24, 2000, until she transferred to Knoxville, Tennessee, on February 10, 2002. Ms. Disler requested the transfer to Knoxville because her husband had to move to Knoxville for his job.[6] Ms. Disler's first assignment in Knoxville was the ETL-Team Relations ("ETL-TR") for Target's store on Clinton Highway. As the ETL-TR, Ms. Disler was responsible for carrying out the human resources functions at that store. Ms. Disler's responsibilities specifically included:

---

[5]The record specifically reflects that Ms. Disler actually received a merit increase in her position as ETL-Logistics resulting in an annual salary of $55,100 [id. at 91]. On March 25, 2001, in her position of ETL-Guest Services, Ms. Disler received her annual merit increase, thereby resulting in an annual salary of $56,800 [id. at 92].

[6]Ms. Disler's husband works for Varian Medical Services as a field engineer on cancer treatment machines.

5

(1) communicating Target's policies and procedures to team members ("TMs");  (2)

insuring the implementation and execution of company policies;  and (3) addressing

complaints from TMs and executives within the store.  Thus, plaintiff understood

Target's policies and procedures, including how to lodge a complaint and how to

address employment issues.  Ms. Disler also acted as a District Resource ("DR") for

human relations whereby she assisted with the investigation and resolution of

complaints from other ETL-TRs and STLs from Tennessee and North Carolina with

their human resources issues.


It must be noted at this juncture that Ms. Disler's salary and benefits

remained the same when she transferred to Knoxville, *i.e.*, her salary was still

$56,800.  Shortly after arriving in Knoxville, Ms. Disler received an additional annual

merit increase of $1,700 on March 24, 2002, thereby increasing her annual salary

to $58,500.  The following year, on March 23, 2003, Ms. Disler received an annual

merit increase of $2,300, thereby raising her annual salary to $60,800.  After

receiving these increases, Ms. Disler was one of the highest paid ETLs in the

Knoxville area.[7]

---

[7]Ms. Disler was compensated at Target's pay grade 12 [*see* Doc. 58, Ex. 28 (filed
under seal)].  ETLs top out at pay grade 12 [*see* Doc. 48, Ex. E, pp.37-38;  *see also* Ex. F,
p.57].  In fact, because Ms. Disler's annual salary was over $60,000, she was approaching
the salary of an STL [*id.*, Ex. E, p.38].

6

While Ms. Disler was employed as the ETL-TR at the Clinton Highway store, Wayne Burkett served as the STL for that store and Jeff DeMoss as the DTL. In early September 2003, DeMoss contacted Burkett to determine if he knew anyone who could fill an opening in the ETL-Logistics position at the Ray Mears Boulevard store (sometimes referred to as "Store 151" or "151"). Burkett immediately responded that Ms. Disler might be an appropriate candidate. Not only did she have previous experience as an ETL-Logistics, but also she did not really enjoy being an ETL-TR. Burkett pointed out that Ms. Disler only took that position because it was available when she transferred from Roanoke and she really wanted to be transferred out of it.[8] Moreover, Burkett recognized that the ETL-Logistics was one of the few positions which would allow Ms. Disler to reach her goal of STL, especially since she could not leave Knoxville on account of her husband's job.

In response to Burkett's comments, DeMoss, pursuant to normal practice, authorized Burkett to approach Ms. Disler and inform her of this opportunity. DeMoss had no "direct communication" with Ms. Disler about the transfer [Doc. 58, App., Ex. 8, p.36].

---

[8]In fact, according to Burkett, Ms. Disler indicated that the ETL-TR was the one position into which she requested Target not transfer her; yet, that is what Target did.

7

Therefore, Burkett approached Ms. Disler about the job. Among other things, he pointed out that the volume of that store was down because of the recent openings of Target stores in Maryville and on Clinton Highway as well as a Super Target. Nevertheless, Ms. Disler was interested, so he instructed her to contact DeMoss, who in turn put her in touch with the STL for Store 151, Kim Canada.[9]

Ms. Disler's recollection of the events pertaining to her transfer to Store 151 is similar:

> [Burkett] approached me and told me that the position [at Store 151] was available and that they felt that I was a good candidate for that position based on my HR[10] background and based on my strengths and leadership and my performance and felt that I would be a good fit for that store and it would be a great promotional opportunity to showcase my talents to become an STL. And I was told that that information came from Jeff DeMoss who was our district manager at that time.

[*Id.*, Ex. 9, pp.117-18]. Also according to Ms. Disler, Burkett told her if she took the ETL-Logistics position at 151, she would have to work overnight for six to eight weeks because of the upcoming holiday season. Because of that, Ms. Disler asked

---

[9]Canada, who had worked for Target since 1982, also held the position of ETL-Logistics at 151 beginning in June 1998 [*see* Doc. 58, Ex. 28 (filed under seal)]. Canada's salary upon assuming that position was $47,000 [*id.*]. Canada remained in that position until December 2001, when she transferred to the SuperTarget to assist in its opening as the ETL-Logistics [*id.*]. When Canada left the ETL-Logistics position at 151, her annual salary was $63,700 [*id.*].

[10]Presumably, this refers to Human Resources.

8

Burkett for a raise. That request, according to Ms. Disler, drew laughter from Burkett. Nevertheless, Burkett informed Ms. Disler that he would ask DeMoss about a raise for her "but not to expect anything because [she] was one of the highest paid executives in the company." [*Id.*, p.120].

DeMoss testifies that he has no present recollection of any conversations about a raise for Ms. Disler upon her transfer to 151.[11] However, DeMoss does testify that a pay raise is usually the result of a change in pay grade level; Ms. Disler, of course, was already at the highest pay grade level for an ETL, *i.e.*, "well compensated, over $60,000, which is approaching [STL] salary." [*Id.*, Ex. 8, p.38]. Hence, there could be no upward change in pay grade level for Ms. Disler.

On September 21, 2003, Ms. Disler accepted the transfer to Store 151 in the position of ETL-Logistics. This was considered a lateral transfer by Target. As a result of that transfer, Ms. Disler received a $1,000 "overnight bonus," thereby increasing her salary for that year to $61,800 [*id.* at 110].

Before discussing Ms. Disler's performance as the ETL-Logistics at 151, it is imperative that the court examine the situation involving Mitchell Garland, the

---

[11]Likewise, Kristin P. Crandall, the Regional Human Resources Manager for Target at that time, has no recollection of any conversations about a salary increase for Ms. Disler.

individual who held that position immediately prior to Ms. Disler's transfer.[12]   When

Garland assumed that position on September 1, 2002, his salary was $60,400 [*see*

Doc. 58, Ex. 28 (filed under seal)].[13]   According to Garland, the prior ETL-Logistics,

Michael Regan,[14] "went out under a cloud.  There were issues with regional human

resources  ... ."  [Doc. 59, App., Ex. 12, p.43].  Furthermore, according to Garland,

"one of the complaints was that [Regan] did not work with the team.  When I went

there, I was instructed to work with the team ... to be a part of things."   [*Id.*].

Additionally, Garland explains that under Regan, "the Logistics processes ... weren't

operating well.  The team wasn't staffed, they weren't scheduling properly, they were

spending astronomical amounts of payroll and not getting the trucks done on time."

[*Id.*].  Garland also describes the turnover as "[v]ery high."  [*Id.*].


        Moreover, according to Garland, the hourly, non-exempt TLs, Yvette

Haynes and Trish Everett, had "complained frequently regarding [Regan's]

performance and level of involvement[,]" meaning he did not push enough freight

---

[12]This now appears to be the only comparator whom Ms. Disler has identified with respect to her EPA claim [*see* Doc. 59, pp.31-33].

[13]It must also be noted that Garland did not receive the $1,000 overnight bonus which Ms. Disler received [*see* Doc. 48, Ex. G, p.80].

[14]Although the spelling of Regan's name in Garland's deposition is "Reagan," Target's confidential documents indicate that it is spelled "Regan."  [*See* Doc. 58, Ex. 28 (filed under seal)].  Thus, the court will refer to this employee as "Regan."  The record further reflects that Regan was hired by Target in May 2000 [*id.*].  His initial salary was $33,000 [*id.*].  Regan assumed the ETL-Logistics position at 151 on October 21, 2001, at a salary of $40,000 [*id.*].

[*see id.*, p.44].  Garland also testifies that Haynes and Everett are "both very hard-working with high pride levels, strong-willed, and not the easiest people in the world to get along with."  [*Id.*].

Garland experienced problems at 151 after being there less than a year and asked Canada if he could be transferred.  He also discussed this with DeMoss during his next visit to 151.  Regarding those problems, Garland testifies as follows:

> I had lost slightly over 50 pounds.  I was having trouble sleeping.  I wasn't eating.  I had no life balance, I wasn't seeing my family, and finally I collapsed on the truck line.

[*See id.*, p.47].  Garland attributes these problems to "working a whole lot of hours at really, really odd times."  [*Id.*].  His "normal day would be 12 to 14 hours" and he relates this extended work schedule to "payroll constraints."  [*Id.*, p.48].  In fact, Garland admits that he would send his hourly employees home and do their work himself in order to meet payroll numbers.  [*Id.*, pp.49-50].  Garland also testifies that Canada openly criticized him when logistics was not running smoothly.  He specifically recalls that it happened on one or two occasions and that it occurred in front of other "[e]xecutives in an executive meeting."  [Doc. 48, Ex. G, p.61].  In general, Garland agrees that Canada would "let [him] know about it" when logistics "blows up on you."  [*id.*].

11

When Garland left that position in October 2003, his base salary was $61,600 [*see* Doc. 58, Ex. 28 (filed under seal)].[15]  According to plaintiff's review of Garland's personnel file [*see id.*, Ex. 29, Ex. B (filed under seal)], Garland also earned a $3,439 bonus for 2003 (which he received in April 2004), thus bringing his total wages to $65,039.[16]

According to DeMoss and Target's written requirements, the ETL-Logistics was responsible for the overall management and supervision of the Logistics Department.  More specifically, Ms. Disler as the ETL-Logistics was responsible for:  (1) operating a safe working environment for her TMs by insuring that her TMs were properly trained and worked in a safe manner;  (2) responding to the TMs' concerns;  (3) insuring the proper selection, scheduling, staffing, training, and review of her TMs;  and (4) building team morale through communication, recognition, and leadership.  Moreover, as manager of the logistics process, Ms. Disler as the ETL-Logistics was responsible for:  (1) managing the receiving processes;  (2) managing the freight flow into the store;  (3) managing the replenishment of merchandise throughout the store;  (4) managing the overall

---

[15]In March 2003, after working in the ETL-Logistics position for six months, Garland received his annual merit increase of $1,200, which raised his salary to $61,600.

[16]The court has also reviewed those same documents which reflect that Garland received $3,439 for an item coded "B".  The court therefore assumes that Code "B" is the bonus to which plaintiff refers.

12

productivity of the inventory department;  (5) controlling expenses within the Logistics Department;  (6) communicating with direct vendors;  (7) insuring the accuracy of the inventory received;  (8) coordinating staffing based upon volume forecasts;  (9) insuring her team members stocked merchandise according to Target's presentation standards;  and (10) insuring the appropriate processing of all charge-backs and supervising the movement of merchandise from the store. According to Target's policy, Ms. Disler, or for that matter any ETL-Logistics, was required to spend more than 50% of her time on these management and leadership responsibilities.  Furthermore, while Ms. Disler was held accountable for overall task completion, she was instructed to accomplish the daily operations through TMs.  It is undisputed that Ms. Disler was aware of these expectations by Target.

As previously noted, Ms. Disler transferred to Store 151 on September 21, 2003.  She worked with Garland two or three days before he left for a new assignment at the Clinton Highway store.  After working a couple of weeks on the day shift, the Logistics Department, in October 2003, began working overnight for the holiday season.[17]  Typically, the Logistics Department returns to a day schedule in January or February.  As it turned out, the Logistics Department at 151 returned

---

[17]Target Stores routinely transfer the Logistics Department to an overnight schedule during the holiday season so that the logistics team does not disrupt Target's customers and vice versa.  It must be noted that Burkett had alerted Ms. Disler to this fact before she accepted that position.

13

to a day schedule in early February 2004 because of staffing issues in the Logistics Department and because some of the Logistics TMs wanted to work overnight.

Ms. Disler testifies that she experienced many of the same problems which had led to Garland's request for a reassignment. Primarily, the Logistics Department was understaffed and had a high turnover. For example, even though Ms. Disler had 20 to 30 TMs in her department, it was her opinion that she really needed 45 to 50 TMs during the holiday season to operate properly.

In her role as department manager, Ms. Disler was supposed to be responsible for hiring, training, reviewing, disciplining, and even terminating TMs in the Logistics Department. It was also incumbent upon Ms. Disler to review her staffing levels, determine the need for additional TMs, and to coordinate for those TMs with the ETL-TR for 151. Ms. Disler was also to personally contact and interview applicants for her department. However, Ms. Disler testifies that she was not able to interview very many applicants because she worked overnight and was not allowed to interview at that time because of security concerns. Consequently, Ms. Disler conducted only four to seven interviews. As it turned out, ETL-TR assumed the responsibility of conducting those interviews. Ms. Disler does admit, however, that she rejected individuals on occasion selected by the ETL-TR for her department.

14

Ms. Disler was also supposed to be responsible for insuring new Logistics TMs were properly trained by pairing them with experienced TMs. If a new TM needed training, Ms. Disler was supposed to provide it. Ms. Disler was also to explain Target's processes to new TMs and to answer any questions which they had. Ms. Disler was also to address TMs' complaints, along with their safety and worker's compensation issues. And Ms. Disler was to assist TMs with career development.

However, Ms. Disler testifies that the training functions became the responsibility of ETL-TR for the most part. Ms. Disler testifies that this training was conducted by a "peer trainer" and that this "program was really set up by Tina McDougall. And she had people go to a peer training class for that." [*See* Doc. 58, App., Ex. 9, p.267]. About the only training Ms. Disler provided was to distribute "information that Target provides as a training tool, which is training materials, paper training materials." [*Id.* at 266]. Ms. Disler and the TLs did, however, recommend employees to be peer trainers. Ms. Disler also testifies that safety and workers' compensation issues were actually handled by the TLs. Moreover, the only complaint which Ms. Disler received from an employee was actually handled by Canada.

15

Ms. Disler was also supposed to direct and monitor her TMs daily work and was supposed to be responsible for insuring that the TMs were properly scheduled.  At times, Ms. Disler conducted team "huddles" at the beginning of the shift during which she assigned TMs their daily work tasks, reviewed company policy, and addressed other questions.  Additionally, Ms. Disler was supposed to monitor and audit her team's work performance and, when a TM struggled or failed to perform his duties in the proper manner, she was supposed to address that issue with the TM.  Ms. Disler was also supposed to prepare and administer performance reviews for her TMs and TLs.  In the event that a TM or TL had performance issues, it was Ms. Disler's responsibility to issue any necessary discipline and to do so when necessary.

However, as it turned out, Ms. Disler testifies that she handled only a very few performance reviews.  Most of those reviews were conducted by other Target employees in August before her transfer to 151.  Additionally, her TLs conducted "quite a few of them" after her arrival [*see* Doc. 58, App., Ex. 9, p.62]. Likewise, Ms. Disler testifies that the TLs conducted many of the so-called "huddles" and also performed the audits and monitored the team's performance.

As the ETL-Logistics, Ms. Disler was also responsible for overseeing the entire operation of the Logistics Department.  Ms. Disler was supposed to plan the

16

appropriate level of staff needed to transition the merchandise according to time lines. In the event that the Logistics Department missed its time lines, Ms. Disler was supposed to re-analyze her time lines and productivity according to Target's trailer management tool and to change the process to meet those time lines. Ms. Disler was also supposed to implement new strategies to improve the logistics processes. Additionally, Ms. Disler was responsible for insuring that her payroll did not go over budget and for reviewing that payroll on a daily basis. If payroll was too high, Ms. Disler was to control it by sending TMs home at her discretion. Ms. Disler was also responsible for forecasting any necessary overtime her team would need and communicating that need to the STL.

Again, as it turned out, the TLs assisted Ms. Disler in the responsibility of staffing. The TLs also scheduled the teams. According to Ms. Disler, Canada took control of the team on occasion and moved employees in and out of Ms. Disler's department.

Without question, Ms. Disler and her STL, Kim Canada, never enjoyed a warm, nurturing relationship. To the contrary, their relationship was one which could best be described as confrontational and tumultuous. And, according to Ms. Disler, the problems between them began a few weeks after Ms. Disler arrived at Store 151 when Haynes and Everett (the TLs) requested that Canada have a

17

meeting with Ms. Disler to insure that she was "pushing freight." [*See* Doc. 59, App.,

Ex. 9, p.140]. Canada did so. Ms. Disler's recollection of that meeting is as follows:

> A.      I was told that I was expected to push freight 100 percent of the time, that as a logistics executive, [Canada] pushed freight and she expected me to push freight 100 percent of the time. That was my job. I was there to push freight.
>
> Q.      What do you mean by pushing freight?
>
> A.      I mean unloading trucks and taking merchandise out of cartons and placing it on the shelves and throwing away the cardboard and doing that repetitiously.
>
> Q.      What did you say to Kim when she made this comment to you?
>
> A.      I actually had an idea what the meeting was about, and I actually printed off copies of my job description and my team leaders job description and the team member job description for those positions and said that my job was to manage those processes and to supervise those processes, that I should not be pushing freight 100 percent of the time. And I was told that the Ray Mears Boulevard store was one of those stores that was different than the rest of the stores in that I would have to push freight 100 percent of the time in that store. I was told that it is one of the most difficult stores in the Knoxville area.

[*See* Doc. 59, App., Ex. 9, pp.140-41].


Ms. Disler testifies further that Haynes and Everett petitioned Canada

frequently to change their schedules. They also generally complained about Ms.

Disler to Canada. Ms. Disler also testifies that Store 151 continued to operate just

as it did before her arrival because Haynes and Everett were resistant to her changes in their schedules and because Canada would agree with these two. According to Ms. Disler, "Kim ran that team ... [and Haynes and Everett] were going to do what Kim wanted because Kim was the STL. And she was telling them to do what it was that they wanted to hear." [*Id.* at 160-61]. For example, Haynes and Everett would put in forty hours within four days and then be off three days in a row. As a result, Ms. Disler had to perform their jobs when they were not there. Those two TLs would also direct the team to do one thing which would be "totally different" than the method she was trying to implement. [*Id.* at 161]. Moreover, when Ms. Disler confronted Haynes and Everett about these matters, they informed her that "Kim doesn't want them to do it that way." [*Id.* at 163-64].

Ms. Disler reported her problems with Haynes and Everett to Canada. Canada responded by telling Ms. Disler to "write them up"; however, she never did so because that action would result in additional problems [*id.* at 163]. Ms. Disler did, however, write disciplinary warnings about other employees.

In addition to confronting Haynes and Everett about work issues, Ms. Disler candidly admits that she was "constantly ... confronting [Canada] about the lack of staffing ... ." [*See* Doc. 67, Ex. 2, p.292]. And she admits further that Canada "perceived me as being somewhat confrontational about it because I was demanding

19

that I be staffed and that I needed help and that things were not right." [*Id.*]. Ms.

Disler also admits that she confronted Canada "[m]ore times than [she] can ... count

... ." [*Id.* at 293]. Ms. Disler also expressed her concerns to Canada regarding the

fact that she had "no work-life balance" because of the hours she was working and

because she was "pushing freight 100 percent of the time [and] ... not able to do the

things that I should be doing as an executive." [*Id.* at 286]. Ms. Disler testifies

further that her work schedule would usually begin at 9:00 or 10:00 p.m. and that she

would leave anywhere between 10:00 a.m. and 4:00 or 5:00 p.m. the next day.

Thus, Ms. Disler was working 16 hour days.

According to Ms. Disler, Canada responded as follows:

> ...  [Canada] would finally tell me she didn't want to hear
> about work-life balance.  She looked at me up and down as
> if I were like some piece of meat sitting in a chair and told
> me, when I asked to leave that store, who would have you.
> And she laughed at me and told me that as a female you
> have to work harder in that position and that nobody in
> another store would take me.  I felt retaliated against.

[*Id.* at 287].  Ms. Disler also testifies that Canada made several other similar remarks

about females having "to work harder in the logistics position."  [*Id.* at 289].

As a result of these problems, Ms. Disler repeatedly requested that she

be allowed to transfer out of the ETL-Logistics position like Garland.  However,

20

Canada refused the request. When Ms. Disler told Canada that this was "discriminatory if you don't let me do the same thing ... and [Canada] said, well, ... if you want to leave ... I can make you leave. I'll just write you up for payroll performance ... then the next shift that I worked, I received an e-mail stating that I was overspent on payroll." [*Id.* at 287]. The record reflects that Canada did indeed send Ms. Disler an e-mail on February 17, 2004, regarding her failure to meet payroll, indicating that she had overspent by 98 hours for the previous week [*see id.*, Ex. L, Dep., Ex. 6 (Target Doc. 0119)]. Canada also informed Ms. Disler in that e-mail that she expected her to meet payroll and that she would document any future failure by her to do so [*id.*].

Also according to Canada, Ms. Disler was informed by her that she could not be transferred from ETL-Logistics at 151 because she had not occupied that position for at least one year and because she was not aware of any available positions for her in the district at that time. Along that same vein, DeMoss testifies that it is Target's practice or "guideline" to require ETLs to remain in their current positions for twelve to eighteen months to "master that position before we move them on to new roles ... ." [*See* Doc. 48, Ex. E, p.30]. It is undisputed that Garland had been in the ETL-Logistics position for more than one year before he was transferred to the Clinton Highway store.

Ms. Disler also testifies that on another occasion when she tried to meet with Canada about the number of hours which she was working, Canada told her that "she didn't want to hear anything I had to say, to get back on the floor, to push freight and not to come to her and talk to her until it was finished." [*See* Doc. 59, App., Ex. 10, p.406]. Ms. Disler did so and eventually collapsed on the sales floor crying [*id.* at 404]. Ms. Disler also testifies that:

> ... I was losing hair, losing sleep, stressed out so much that I couldn't stand it any more. And I felt like I was being pushed in the ground and things purposely put in my way to not be able to achieve what was being expected of me and the fact that I was being demeaned for it.

[*Id.*, Ex. 9, p.281].

Ms. Disler also claims that Canada publicly belittled and demeaned her. For example, Canada gathered the Logistics Department employees together and laughed when she indicated that "Christin will get the team together eventually." [*Id.*, Ex. 10, pp.406-07]. However, Ms. Disler also admits that Canada talked in a demeaning manner to other employees such as Lashara Carter and Brig Schrock [*id.* at 407].

Ms. Disler complains further that Canada openly criticized her in a phone call to Burkett. Specifically, Ms. Disler testifies:

22

I was in the back separating some pallets of merchandise and stuff to be pushed to the floor, working with some freight and stuff. And [Canada] was very loudly, in a condescending tone, saying I'm over this logistics, I'm over the logistics team, I'm sick of this logistics, I'm going to change this logistics. And I knew, by her tone, that she was referring to me.

[*Id.* at 298-99].

On another occasion, Ms. Disler complains that Canada publicly demeaned her by harassing her over walkie-talkies which were carried by TMs and other executives. In particular, Ms. Disler testifies as follows:

Q.   Conversations, so there were several different times when [Canada] had conversations over the walkie?

A.   Correct, uh huh.

Q.   Tell me about those conversations.

A.   I don't remember the exact conversations and there were several of them and almost daily, and usually it was, where are you, what are you doing, what do we have left, it was conversations that normally you would come to a person and speak to that person about instead of hounding them on a walkie talkie and, you know, well, when are you going to be finished, you know, that was the time-line, give me a time-line now, those kinds of things, that's harassment.

Q.   Okay. Anything else other than those kinds of conversations that you can think of that were harassing?

A.   Not that I can recall sitting here right now, no.

Q.   Anything that would help you recall?

23

A.       No, I'm sorry.

[*See* Doc. 67, Ex. 2, pp.421-22].[18]

The record reflects that Ms. Disler had problems dealing with other ETLs at 151.  That finding is supported by e-mails circulated by Ms. Disler to other ETLs and Canada criticizing their work.  [*See* Doc. 48, Ex. L, Dep. Ex. 6 (Target Doc. 0128-132;  0137-38)].  Canada responded to one of Ms. Disler's e-mails "make sure you are hitting your time lines with the truck before you go ... challenging everyone else on caf[19] pulls not being done."  [*Id.* at Target Doc. 0114].

After receiving that particular e-mail from Canada, Ms. Disler submitted her voluntary resignation via e-mail to Canada some eight hours later on March 4, 2004, stating specifically as follows:

---

[18]It appears that Ms. Disler is attempting to expound on her deposition testimony through her declaration filed in response to defendant's motion for summary judgment [Doc. 59, App., Ex. 13].  The court is rarely impressed with a declaration or affidavit filed by any plaintiff in response to a motion for summary judgment.  This is especially true in this case because the parties have taken over 400 pages of Ms. Disler's deposition.  To the extent that any of this declaration contradicts any of her previous deposition testimony or even attempts to expound upon it, it is entirely improper and will not be considered by the court.  *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.").

[19]A "CAF pull" is apparently one of Target's systems whereby the computer calculates information based on hourly sales, thereby telling the employees in the Logistics Department what merchandise must be restocked.

24

Due to the lack of public support for logistics (which contributes to missed timelines), the lack of respect and professionalism that statements like this in email to the entire exec team (which by the way you forgot to copy me on), public demeaning in store huddles and on the walkie, I refused to any longer work under these conditions. This is a big reason that the previous LOG [Garland] requested to move and I refuse to subject myself to these same things.

I am hereby resigning my position with Target and am tendering a 3-week notice effective today 3/4/04. My last day will be 3/24/04.

[*Id.* at Target Doc. 0114]. As it turned out, Ms. Disler's last day with Target was March 10, 2004, since she was given the opportunity to be paid in lieu of working until the end of her notice; thus, she remained on Target's payroll until March 24, 2004.

The first complaint which Target received from Ms. Disler regarding Canada was six days later on March 10, 2004, when she called Target's Integrity Hotline [*see id.*, Ex. 24]. In the written report of that phone call, Deanna Koenen, the Human Resources Hotline Employee Relations representative, reported to Shelley Zabek, the Regional Human Resource representative, the following:

The following Hotline report is from T151 [Store 151]. The caller, Christ[i]n Disler, stated that the STLs conduct is inappropriate and because of the conduct she has chose[n] to resign. I tried contacting Christ[i]n, however, the number provided has been disconnected.

You are probably aware of this situation since she indicated she sent a resignation letter to district and regional representatives. Let me know your thoughts regarding the allegations and how we are investigating.

[*Id.*]. The details of Christin's call are set forth as follows:

Christ[i]n Disler stated Kim Canada behaves unprofessionally and inappropriately toward team members and leads. Christ[i]n stated Kim routinely reprimands associates over the store "walkie" without concern that others will hear these comments. Christ[i]n stated she submitted her resignation on March 4, 2004, because she can no longer work with Kim's conduct. Christ[i]n stated she copied her resignation to the district and regional team leaders (names withheld).

Christ[i]n stated that she has every intention of fulfilling her obligations in the next three weeks but fears Kim will retaliate against her during this period. Christ[i]n stated that she was unable to access her email account on March 9 because she was taken out the system. Christ[i]n believes Kim is responsible for this retaliatory action because of the content of her resignation letter. Christ[i]n does not want to spend her last weeks working under fear of retaliation. Christ[i]n stated that she is further concerned Kim's behavior towards other team members will continue and hopes this report will initiate an investigation into Kim's conduct.

[*Id.* at Target Doc. 0072].

Ms. Disler also complained about Canada during her exit interview with Zabek held on March 11, 2004, the day after her last day of employment at Target. Ms. Disler complained about: (1) Canada's leadership; (2) Canada's support of the

26

executives working for her;  (3) the need for more equipment;  (4) the sales floor team not assisting logistics;  (5) Canada acting unprofessionally;  (6) Canada's managerial philosophies;  (7) other executives being paid more;  (8) another ETL at 151 lying about having cancer;  (9) working overnight longer than anticipated;  (10) working longer hours;  (11) ETLs looking for other jobs;  (12) not being allowed to move to another store;  (13) staffing levels;  (14) Target paying out her notice;  (15) not having access to e-mail after she resigned;  (16) the ETL-TR at 151, Tina MacDougal;  and (17) Canada's e-mail regarding her overspending payroll [*see id.* at Target Doc. 0065-70].  It is indeed significant, however, that Ms. Disler did not mention discrimination or unlawful retaliation whatsoever during that exit interview.

Within a few weeks, Ms. Disler had retained attorney Robert L. Bowman and his law firm, Kramer, Rayson, Leake, Rodgers & Morgan, LLP., to represent her regarding her employment issues with Target.   On March 23, 2004, attorney Bowman sent a letter to DTL Donnie Dockery stating, among other things, as follow:

> This firm has been retained by Christin Disler regarding manifold claims arising out of her employment with Target ... .   These claims include ... misclassifying her as an exempt employee and failing to pay her overtime in violation of the Fair Labor Standards Act, sex discrimination in violation of Title VII of the 1964 Civil Rights Act and the Tennessee Human Rights Act, in violation of the Equal Pay Act, and a claim for retaliatory harassment by her former supervisor.

27

>We also want to put Target on notice that it should preserve certain evidence which will be pertinent in the forthcoming litigation. These documents include Ms. Disler's desk blotter, her work schedule which is located under her desk, all e-mails to, from or concerning Ms. Disler, and *all surveillance videos taken by the company during Ms. Disler's work hours.*
>
>. . .

[*See* Doc. 44, App., Ex. 9 (emphasis added)].

It is undisputed that Target has a very elaborate videotape monitoring system that captures almost every part of Store 151. According to Alvin Lynch, the Assets Protection Manager responsible for the videotapes, "we have monitoring videotapes ... surveillance videotapes, and ... abnormal surveillance tapes."[20] [*See id.*, Lynch dep. at pp.15,19]. There are 32 monitoring video cameras throughout the store and six surveillance cameras. The six surveillance cameras are "used for investigative purposes [and] ... are aimed at specific locations." [*Id.* at 24]. They are moved from location to location based on tips about shoplifting and shortages based on audits. Target keeps these videotapes for "the life of the investigation ... and maintains them [in some instances] forever." [*Id.* at 30].

Monitoring cameras are also permanently stationed and are found at the exit, parking lot, receiving bay doors, compactor, electronic stock room, one-hour

---

[20]Apparently, abnormal surveillance tapes are tapes made from a compilation of other tapes shot in the store; those tapes are not at issue in this case, however.

photo, pharmacy, entrance, food court, fitting rooms, cash office, cash office man trap, and stock rooms A and B. These cameras "are all recording simultaneously, but each specific shot only records three seconds of information ... and starts to record again. The reason for this is that you can elongate an eight-hour tape ... up to 48 hours." [*Id.* at 22]. Target's standard policy is to maintain monitoring videotapes 31 days, but Lynch "extend[s] that policy at Target 151 ... to 60 days ... but I end up averaging 45 days." [*Id.* at 29-30].

It is undisputed that Dockery received attorney Bowman's letter on or about March 23, 2004,[21] and immediately called Zabek in Atlanta and informed her about the letter. Zabek instructed Dockery to fax it to her and subsequently told Dockery that she would "handle it from there ... ." [*Id.*, Dockery dep. at 37].

Canada also received a copy of the letter, but she chose to ignore it. Canada testifies, however, that she did look for other items in the letter, *i.e.*, Ms. Disler's desk blotter, her work schedule, and all e-mails to, from, or concerning Ms. Disler. She never approached Lynch about the videotapes, even though Lynch reports directly to her regarding "issues in [her] building." [*Id.*, Canada dep. at 99]. Lynch eventually came to Canada and told her that Tony Boncore "was wanting the

_____

[21]Attorney Bowman's letter reflects that it was faxed to Target on March 23, 2004; therefore, it is understandable how DTL Dockery received the letter so promptly.

29

surveillance videotapes if we could find them ... ."  [*Id.* at 103].  Canada testifies further that it would not have been a violation of company policy for her to communicate the request for the videotapes to Lynch.

Zabek also received a copy of the letter from Dockery on March 23, 2004, and faxed it to the "Employee Relations Department at Headquarters."  Target ultimately made the decision to destroy the monitoring videos because, in Zabek's words, "we weren't asked to produce the public view videos [monitoring videos].  We were asked to produce surveillance videos for which we had no surveillance videos." [*Id.*, Zabek dep. at 91;  *see also* Defendant's Response to Request for Admissions No. 25;  *see also* Defendant's Responses to Plaintiff's Fourth Requests for Production of Documents for No. 1].  Zabek made this decision for Target and she testifies that there was no discussion about preserving public view videotapes.

It is undisputed that Target possessed monitoring videotapes that captured Ms. Disler's work activities for 30 to 60 days prior to March 23, 2004. When Lynch was asked if such videotapes existed on March 23, 2004, he answered, "I'm sure there were."  [*See id.*, Lynch dep. at 32].  When asked "if Ms. Disler was pushing freight ... would a monitoring video have captured her doing that during the time of March 23, 2004 and the days prior to," Lynch responded, "[y]es."  [*Id.* at 33].

Finally, in considering Target's purported distinction between monitoring videotapes and surveillance videotapes, it is indeed significant that when Canada was asked if she was aware of the distinction between the two, she testifies, "not that I know of." [*Id.*, Canada dep. at 95]. In fact, Canada even referred to the monitoring video cameras as "surveillance video" during her deposition [*id.*]. Likewise, DeMoss, incorrectly refers to "surveillance cameras" as the video cameras which would have captured Ms. Disler at work [*see id.*, DeMoss dep. at 75-76]. Along this same vein, Zabek testifies that Target's "directives" regarding the distinction between these two types of videos is only available to Target's employees through its website or on any posted documents [*see* Doc. 55, Ex. 7, p.92]. Those directives are not available to the general public [*id.*].

Ms. Disler filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 31, 2004, almost four weeks after she resigned [*see* Doc. 14, Ex. 1]. Attorney Bowman then filed this lawsuit on behalf of Ms. Disler against Target on April 29, 2004 [*see* Doc. 1].

31

III.

## *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)). The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the moving party bears the initial burden, it need not support its motion with affidavits or other materials "*negating*" the opponent's claim. *Id.* at 323 (emphasis in original); *Adock v. Firestone Fire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir. 1987). Rather, "the burden on the moving party may be discharged by `showing' - that is, pointing out to the district court - that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325.

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving

32

party to come forward with specific facts to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* However, the non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249-50.

Upon review of all of the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the non-moving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991), *cert. denied*, 503 U.S. 939 (1992). Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party." *Liberty Lobby*, 477 U.S. at 250; *Stein v. National City Bank*, 942 F.2d 1062, 1064 (6th Cir. 1991).


IV.

### Law and Analysis

A.

### Title VII Claims[22]


i.    *Preliminary Observations*


Before addressing Ms. Disler's specific Title VII claims, a few preliminary remarks are in order to place this case in a proper context.  Because Ms. Disler contends that Canada's harassment of her is sufficiently severe or pervasive to constitute a hostile work environment, it is incumbent upon the court to consider the totality of the circumstances.  *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances");  *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75 (1998) (discussing hostile work environment in the context of same

---

[22]Ms. Disler's state law employment discrimination claims under the THRA require the same standards of proof as they do under Title VII;  therefore, the THRA claims will not be analyzed separately.  *See Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001).

sex discrimination).  The record clearly reflects, and there is no proof to the contrary,

that Target's conduct regarding Ms. Disler for almost four years prior to her transfer

to Store 151 was beyond reproach.  To reiterate, Ms. Disler held her first position as

the ETL-Logistics in Roanoke, Virginia, for only six months when she developed

health problems which prevented her from being on her feet for any appreciable

period of time.  In fact, she was actually confined to a wheelchair for some of that

time.  Consequently, Target immediately accommodated her by moving her into the

less strenuous position of ETL-Guest Services.  Yet, Ms. Disler's salary and benefits

remained the same after the transfer.   The record also reflects that Ms. Disler

complained about one of her team members, a male, who made inappropriate

comments about her breasts.  Target responded to her complaint and to those of

other TMs and terminated that male employee.

Additionally, the record reflects that Ms. Disler served in her capacity as

ETL-Guest Services in Roanoke until she transferred to Knoxville, Tennessee, a

transfer which she requested as the result of her husband moving to Knoxville for his

job.  Again, Target honored her request and even placed her in a comparable

position of ETL-TR at the Clinton Highway store.  Ms. Disler's salary and benefits

remained precisely the same when she transferred to Knoxville.  Furthermore, Ms.

Disler received her annual merit increase less than two months after her arrival in

Knoxville.  Ms. Disler also received her annual merit increase the following year,

thereby raising her annual salary to $60,800, which was her salary at the time of her transfer to Store 151.

Finally, the court observes that Ms. Disler's transfer from the Clinton Highway store to Store 151 was not in and of itself any type of adverse employment action. To the contrary, STL Burkett had recommended Ms. Disler to DTL DeMoss because of Ms. Disler's previous experience as an ETL-Logistics and because Ms. Disler did not really enjoy the position of ETL-TR. In fact, Burkett recognized that the ETL-Logistics position was one of the few positions which would allow Ms. Disler to reach her goal of becoming an STL, especially since she could not leave the Knoxville area on account of her husband's job. Thus, all of the evidence indicates that Ms. Disler's transfer was perceived by the Target supervisors as one which would be a positive move for her. And it must be underscored too that Ms. Disler voluntarily accepted the transfer to Store 151. She also accepted that position knowing that she would have to work overnight during the holiday season. Furthermore, there is no evidence to suggest that Target was insistent that she take the position nor any evidence that her failure to do so would have adversely impacted her continued employment at Target. In all likelihood, Ms. Disler took the position at 151 to facilitate her goal of becoming a STL. Ms. Disler's transfer to Store 151 was, to use an overworked phrase, considered to be a "Win-Win" situation for both parties to this litigation.

36

ii.   *Hostile Work Environment Claims*

Ms. Disler's Title VII hostile work environment claims are two-fold; to be more precise, her claim is, as the Supreme Court has recently recognized, a "compound" claim.  *See Pennsylvania State Police v. Suders*, 542 U.S. 129,  ___ , 124 S. Ct. 2342, 2354 (2004).  First, Ms. Disler claims that Canada discriminated against her by subjecting her to a hostile work environment based on her gender. Second, Ms. Disler claims that this hostile work environment resulted in a constructive discharge because Canada created working conditions so intolerable that a reasonable person would have felt compelled to resign.   As will be demonstrated shortly, the court finds that both of these claims fail for several reasons.  Most significantly, there is no evidence in this record to suggest that sex played even the slightest role in Canada's conduct toward Ms. Disler.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a violation of Title VII, without having to prove a tangible employment action, by proving that sex-based discrimination created a hostile or abusive working environment.  *See Meritor Savings Bank v.*

*Vinson*, 477 U.S. 57, 66 (1986);  *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).

To establish a hostile work environment claim, Ms. Disler must show that:  (1) she is a member of a protected class;  (2) she was subject to unwelcomed sexual harassment;  (3) the harassment was based on her sex;  (4) the harassment created a hostile work environment;  and (5) Target failed to take reasonable care to prevent and correct any sexually harassing behavior.  *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir. 2000);  *Williams*, 187 F.3d at 560-61. For the sexual harassment to be actionable, the workplace must be permeated with discrimination, intimidation, ridicule, and insult which is "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment."  *See Powell v. Morris*, 37 F. Supp.2d 1011, 1016 (S.D. Ohio 1999) (quoting *Meritor*, 477 U.S. at 67).  Moreover, the conduct in question must be judged by both an objective and a subjective standard.  The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as such. *See Bowman*, 220 F.3d at 463 (relying on *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22).  In making this assessment, as previously noted, courts must consider the "totality of the circumstances."  *See Williams*, 187 F.3d at 562 (relying on *Harris*, 510 U.S. at 23;  *Oncale*, 523 U.S. at 81).  Hence, this court must consider the

38

frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *See Harris*, 510 U.S. at 21; *Bowman*, 220 F.3d at 463.

Additionally, "[n]on-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, [she] would not have been the object of the harassment." *See Bowman*, 220 F.3d at 463. Thus, "[a]ny unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *See id.* (quoting *Williams*, 187 F.3d at 565). Said otherwise, "the law recognizes that non-sexual conduct may be illegally sex-based where it evinces 'anti-female animus.'" *See Williams*, 187 F.3d at 565 (citing *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988)). However, because Title VII is not meant to be a "general civility code," *see Bowman*, 220 F.3d at 464 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), it prohibits only discrimination and harassment based on sex. *See id.*, at 463-64. The critical issue in this analysis is whether members of one sex are subjected to disadvantaged terms or conditions of employment to which members of the other sex are not subjected. *See Oncale*, 523 U.S. at 80.

39

In order to survive Target's motion for summary judgment, Ms. Disler must sustain her burden of proof as to each of the five elements of her claim. Ms. Disler clearly satisfies the first element as she is a female; thus, she is a member of a protected class.

Ms. Disler must next show that she was subjected to unwelcomed sexual harassment. Even considering the facts in the light most favorable to Ms. Disler, as the court must do in considering a motion for summary judgment, Ms. Disler has failed to present evidence sufficient to satisfy this element.

In order to sustain her burden of proof on this element, Ms. Disler must demonstrate that Canada's conduct is "'unwelcome' in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Balletti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1547 (S.D. Fla. 1995)[23] (quoting *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982)). "Where a plaintiff's action in the work place shows that she was a willing and frequent participant in the conduct at issue, courts are less likely to find that the

---

[23]The court recognizes that *Balletti* involves a more conventional claim of sexual harassment by male employees against a female employee; here, of course, there is no such claim of actual sexual harassment by Canada against Ms. Disler. Thus, even though *Balletti* is of limited usefulness in analyzing the instant case, some of its analysis is still appropriate for consideration by this court in discussing the concept of "unwelcome" harassment.

conduct was 'unwelcome' or 'hostile.'" *Id.* (citations omitted). Here, Ms. Disler characterizes herself as "confrontational" at work, admitting to confronting Canada constantly about work-related matters - the same type of conduct which she now alleges as harassment. Ms. Disler's admitted participation, even willing if not eager participation, in constant confrontation with her direct supervisor completely undermines her allegation that she was subject to unwelcome harassment.

There is a second reason why this purported harassment was not perceived by Ms. Disler as unwelcome. Given the fact that Ms. Disler was extremely familiar with Target's procedures for reporting unwelcome harassment and discrimination (from her previous position as ETL-TR and as a DR), it is absolutely inconceivable to the court that Ms. Disler never reported Canada's harassment to the DTL or to HR if it were indeed unwelcome. It is likewise telling that Ms. Disler did not mention harassment in her telephone call to Target's Integrity Hotline, nor did she mention harassment in her exit interview with Zabek held on March 11, 2004. Only after she hired an attorney to represent her did Canada's comments about work-related issues transform themselves to conduct now described as harassment.

Even assuming that Canada's conduct could be classified as "unwelcome harassment," Canada's conduct was most certainly not based on Ms. Disler's sex. The only arguable evidence in this record that any alleged harassment

41

by Canada was based on sex is Ms. Disler's testimony that Canada told her several times "that as a female you have to work harder in the logistics position." [*See* Doc. 59, App., Ex. 9, p.289]. In the court's view, these otherwise innocuous remarks coming from a female supervisor to a female employee are insufficient to prove that Canada's behavior was motivated by a prejudice against women in the workplace. To the contrary, Canada's comments simply indicate that she was attempting to give Ms. Disler advice as to how to succeed in that position based on her own previous experience as the ETL-Logistics at Store 151.

But there is even a more fundamental reason why Ms. Disler cannot prove that any harassment by Canada was based on sex. The Achilles heel in Ms. Disler's case on this issue is Canada's conduct toward the previous ETL-Logistics, Mitch Garland, a male. According to the undisputed testimony and evidence in this record, Garland experienced the same problems as ETL-Logistics under Canada as did Ms. Disler. Garland testifies that during the year in which he held this position, his normal day would be twelve to fourteen hours and he relates this extended work schedule to "payroll constraints." [*See* Doc. 59, App., Ex. 12, p.48]. Garland, like Ms. Disler, would send his hourly employees home and do their work himself in order to meet payroll numbers. Garland also testifies that Canada openly criticized him when logistics was not running smoothly. As a result of the hours and the stress involved in that position, Garland testifies that he "had lost slightly over 50 pounds

42

[and that he] was having trouble sleeping [and that he] wasn't eating [and that he] had no life balance [and that he] wasn't seeing [his] family [until he] finally collapsed on the truck line." [*See id.*, p.47].

Garland might as well have testified for Ms. Disler. Parroting much of what Garland stated, Ms. Disler too complains of working twelve to sixteen hour days. She complains that she had no "work-life balance." [*See* Doc. 67, Ex. 2, p.287]. Her physical symptoms included losing sleep like Garland. Garland lost weight; Ms. Disler lost hair. Both were stressed to the point that both eventually collapsed on the floor of the workplace.

It must be emphasized too that Regan, the ETL-Logistics prior to Garland, also had similar problems running logistics. There were problems with staffing, scheduling, spending too much payroll, and not unloading the trucks on time. Regan also experienced problems with high turnover, as did Garland and Ms. Disler. These common underlying problems were, of course, the source of stress for the ETL-Logistics at Store 151. Logistics was not given sufficient resources to perform its function and Canada exacerbated this situation in her treatment of the ETL-Logistics. Sex had no role in any of these ETL-Logistics' difficulties, including those of Ms. Disler.

43

In Title VII actions, it is critical to distinguish between harassment and discriminatory harassment. As the Sixth Circuit noted in *Bowman*, "while [the plaintiff] may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender." *Bowman*, 220 F.3d at 464; *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("personal conflict does not equate with discriminatory animus"). Here, Ms. Disler offers no evidence whatsoever to demonstrate that Canada acted as she did because Ms. Disler is a woman, or that any hostility in her workplace was in some way related to her sex. Rather, the proof in this record compels the conclusion that Canada equally abused those employees in the position of ETL-Logistics in the same manner, whether they were male or female.

Even assuming Ms. Disler could establish the first three elements of her hostile work environment claim, she cannot establish the fourth element, that the harassment created a hostile work environment. Again, courts must consider the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *See Harris*, 510 U.S. at 21; *Bowman*, 220 F.3d at 463.

Ms. Disler's allegations regarding this factor consist primarily of Canada's comments concerning her work performance (*e.g.*, "I do expect you to

44

make payroll," "I'm sick of this logistics, I am going to change this logistics."). In the court's view, these remarks simply reflect a manager with high expectations for both male and female ETL-Logistics. Furthermore, some of this tension between Canada and Ms. Disler was escalated by Ms. Disler, who testifies that she was "constantly ... confronting [Canada] about the lack of staffing ... ." It would also be difficult to conclude that Ms. Disler was subjected to a hostile environment on a regular basis because Canada primarily worked the day shift and Ms. Disler the night shift. Consequently, limited opportunities existed for Ms. Disler to be working in a hostile work environment created solely by Canada. *See Duggins v. Steak 'n Shake, Inc.*, Nos. 99-4264, 99-4313, 2001 WL 92166, *8 (6th Cir. Jan. 26, 2001) (affirming summary judgment where the plaintiff did not routinely work with her alleged harasser and thus was not subject to severe and pervasive harassment).

Additionally, Ms. Disler has made no allegations whatsoever of any physically threatening behavior. At most, Ms. Disler perceived Canada's remarks to be humiliating. Canada's remarks do not, in the court's opinion, amount to discriminatory changes in the terms and conditions of her employment. Ms. Disler's allegations seem to fall woefully short of those in other cases when much more severe and pervasive harassment has occurred; yet, the courts have not found even those incidents sufficient to create a hostile work environment. *See Bowman*, 220 F.3d at 459-63 (supervisor's "litany of abuses," including rubbing plaintiff's shoulders,

grabbing his buttocks, asking him to try out the whirlpool, and asking him to "enjoy himself" by swimming in the pool alone with her was not severe and pervasive); *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000) (concluding an act of battery coupled with two offensive remarks over a six-month period does not create a hostile work environment); *Williams*, 187 F.3d at 559 (holding fifteen separate incidents of sexual harassment over a one-year period, including derogatory remarks, sexually explicit comments, exclusion of plaintiff from certain workplace areas, denial of overtime, and physical touching, was not severe or pervasive enough to create a hostile work environment); *Barnett*, 153 F.3d at 342-43 (a supervisor's belittling comments and use of plaintiff as the butt of jokes were based on personal conflict rather than "sex"). Consequently, Ms. Disler's allegations do not rise to the requisite level of severe or pervasive. Her claim for hostile working environment simply has no merit.

Ms. Disler also claims constructive discharge based on a hostile working environment. As the Supreme Court has recently stated, the burden is clearly on Ms. Disler to show "something more" with respect to this claim - she "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Suders*, 542 U.S. at __ , 124 S. Ct. at 2354. Obviously, because Ms. Disler's claim for a hostile working environment fails, it naturally follows that her claim for constructive discharge based on a hostile working environment

also fails.  In other words, if Ms. Disler cannot demonstrate a hostile working environment, she cannot demonstrate the "something more" which is necessary to prevail on this claim.  Consequently, both of Ms. Disler's claims with respect to a hostile working environment must be dismissed.

iii.   *Failure to Receive a Raise*

Ms. Disler's next claim pursuant to Title VII is that Target discriminated against her by refusing to give her a raise upon her transfer to Store 151.  More specifically, Ms. Disler alleges that STL DeMoss discriminated against her based on her gender because he failed to give her a raise upon her transfer to the ETL-Logistics position at 151.  This claim too fails for several reasons.

First, Ms. Disler has provided no evidence whatsoever to prove that DeMoss' decision was based on sex.  It must be emphasized that Ms. Disler did receive a $1,000 overnight bonus upon her transfer to Store 151.  While Ms. Disler argues that this overnight bonus was not a raise, it is significant that Garland, the previous ETL-Logistics, did not receive an overnight bonus upon his transfer to 151.  Furthermore, the failure to give an employee a raise upon a lateral transfer does not by itself entail an adverse employment action.  *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) ("[a] materially adverse change might be indicated by a

47

termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.") (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) ("reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."). Although it could be argued that Ms. Disler's change from a day shift to a night shift was an adverse employment decision, the proof in this case suggests otherwise. Ms. Disler voluntarily agreed to this lateral change, including the change to the overnight schedule during the holiday season. And, of course, the reason she did so is that a transfer to the ETL-Logistics position would be conducive to attaining her goal of becoming an STL. Apparently, in the Target hierarchy, remaining in her previous position of ETL-TR would not. Thus, the court does not perceive this lateral transfer as any sort of adverse employment action.

Even assuming that the court were to find that DeMoss' decision to refuse Ms. Disler's request for a raise upon her lateral transfer to be discriminatory based upon her sex, the court finds that Target has provided a legitimate, non-discriminatory reason for its decision: Ms. Disler was already one of the highest paid executives in the Knoxville area and was not moving upward in pay grade levels.

48

In response, Ms. Disler argues that Target's proffered reason is pretextual. To establish pretext, Ms. Disler must show that Target's explanation is unworthy of credence. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997). Ms. Disler must establish that Target's articulated reason (1) has no basis in fact; (2) did not actually motivate the employment decision; or (3) was insufficient to motivate the employment action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Here, Ms. Disler argues that Target's reason should be disbelieved because neither DeMoss nor Crandall have any specific memory of what occurred relative to Ms. Disler's transfer to Store 151. Most certainly, the record reflects that, two years later at their depositions, these two individuals did not remember exactly what occurred. Nevertheless, DeMoss did testify that a pay raise is usually the result of a change in pay grade level and that Ms. Disler "was already at the highest pay grade level for an ETL, *i.e.*, well compensated, over $60,000, which is approaching [STL] salary." [Doc. 58, App., Ex. 8, p.38]. Therefore, there could be no upward change in pay grade level for Ms. Disler.

Ms. Disler also contends that Target's reason for denying her a pay raise is pretextual because Garland received a raise when he transferred into the ETL-Logistics position at 151. However, the record reflects that Garland was moved

49

from a pay grade 10 to a pay grade 12 around the same time he was transferred to the ETL-Logistics position at Store 151; thus, Target contends that he was given a raise primarily related to the change in pay grade levels rather than any change in position. Significantly, Garland's salary was $5,900 less than Ms. Disler's before he received the jump to the pay grade 12 level. Hence, Garland was "bumped up" so that his pay would be commensurate with the pay level of other highly paid executives at Target at that time.

The court finds that Ms. Disler has presented no credible evidence that Target's explanation has no basis in fact or that Target's goal of paying Garland like other executives did not actually motivate its decision to give him a raise. Furthermore, the court concludes that Target's reason was more than sufficient to motivate its decision regarding Garland.

Finally, Ms. Disler attempts to establish that Target's legitimate non-discriminatory reason was pretextual by alleging that Stan Johnson and Bobby Burke received raises upon their transfers.[24] However, to do so, Ms. Disler must establish that she, Johnson, and Burke are similarly situated in all relevant aspects.

---

[24]During her deposition, Ms. Disler testifies that she knew of only one individual, Stan Johnson, who received a raise upon transferring [*see* Doc. 67, Ex. 2, p.125]. However, Ms. Disler did not know the amount of his raise [*id.*]. Once again, Ms. Disler's recent declaration interjecting Bobby Burke into this issue is entirely inappropriate and must be disregarded for that reason alone. *See Reid*, 790 F.2d at 459-60.

*Johnson v. Kroger*, 319 F.3d 859, 867 (6th Cir. 2003) (Plaintiff could not establish pretext for unlawful discrimination by comparing himself to other employees without establishing that they were "similar in all relevant aspects").  Here, Ms. Disler has provided no evidence to establish that she was indeed similarly situated to either Johnson or Burke.  In particular, Ms. Disler has failed to identify how long either had been employed by Target, the positions they held before and after their transfers, their immediate supervisors who would have had input into any decision for a raise, their job duties, or even the stores to which they transferred.  Based upon the dearth of evidence in this record with respect to these two individuals, Ms. Disler cannot carry her burden of establishing that she was similarly situated to either Johnson or Burke.   Consequently, Ms. Disler cannot establish pretext and her gender discrimination claim with respect to her failure to receive a raise fails totally.

iv.  *Retaliation*

Finally, Ms. Disler contends that Target violated Title VII by subjecting her to retaliation.  Specifically, Ms. Disler alleges adverse action and retaliatory harassment.

In order to prove a *prima facie* case of Title VII retaliation, plaintiff must prove that:  (1) she engaged in activity protected by Title VII;  (2) this exercise of

51

protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted). In this case, the court finds that Ms. Disler cannot even satisfy the first element because there is nothing to reflect that she engaged in any protected activity.

In order to establish that she engaged in protected activity, Ms. Disler must prove that she either participated in Title VII proceedings or opposed a violation of Title VII. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989). It is clear from this record that Ms. Disler did not participate in any Title VII proceedings while employed by Target. Ms. Disler did not file an EEOC charge until March 31, 2004, some four weeks after she resigned. Consequently, her EEOC charge cannot provide a basis for her retaliation claim.

Ms. Disler can also engage in protected activity by demonstrating that she opposed a violation of Title VII. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-81 (6th Cir. 2000). Here, plaintiff hinges her whole retaliation claim on her deposition testimony where she told Canada she was "discriminating" against her

52

by not allowing her to transfer like Garland. Even assuming that Ms. Disler employed this word, the court concludes that Ms. Disler's mere utterance of this word comes nowhere close to reaching the necessary threshold. Ms. Disler did not inform Canada that she was being discriminated against based on her sex. Indeed, Ms. Disler never thought she was being discriminated against on the basis of her sex at that time because she did not even make that charge when she called Target's Integrity Hotline. Nor did Ms. Disler make any mention of sex discrimination during her exit interview. Ms. Disler did not do so because she had no good faith belief that discrimination played any role in Canada's refusal to transfer her to another store. Ms. Disler knew that she had not been employed in her ETL-Logistics position long enough to be transferred. Moreover, Ms. Disler can hardly be heard to complain about an act that occurred before that complaint, *i.e.*, Target's failure to transfer, and then call it retaliation as a result of that complaint. There is no causal connection. Consequently, Ms. Disler's claim of retaliation by either participation or opposition simply has no merit whatsoever.[25]

---

[25]Because of the weak nature of this claim, the court does not intend to address Ms. Disler's purported causes of action for retaliation under the THRA, EPA, or FLSA. Indeed, plaintiff has not elucidated how her claim for retaliation would differ under any of those statutes. Suffice it to say, the court is not the least bit impressed with this particular claim. Moreover, without engaging in an extensive analysis, the court is of the opinion that Ms. Disler's claim on this basis does not meet any of the four requirements laid down by the court in *Morris*. The court also concludes that Target can easily meet its affirmative defense to retaliatory harassment by a supervisor. *See Morris*, 201 F.3d at 793.

B.

*EPA Claims*

Ms. Disler next alleges that she was paid less than male comparators while performing equal work in violation of the EPA and Title VII.[26]  In order to establish a *prima facie* case of wage discrimination, Ms. Disler must show Target pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.  *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (quotations and citations omitted).  If Ms. Disler establishes a *prima facie* case, the burden then shifts to Target to establish that any wage differential is justified under one of the four affirmative defenses set forth in the EPA:  (1) a seniority system;  (2) a merit system;  (3) a system which measures earnings by quantity or quality of production;  or (4) any other factor other than sex. *Id.*

With respect to her EPA claim, Ms. Disler has now limited her comparator to one individual, Mitch Garland, who was employed as the ETL-

---

[26]Although plaintiff may pursue her equal pay claims pursuant to the EPA or Title VII, when a claim alleges unequal pay for equal work as Ms. Disler claims, the legal analysis is essentially the same under either Title VII or the EPA.  *See Odomes v. NuCare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981).

54

Logistics prior to her arrival. The record reflect that Ms. Disler's base pay upon her transfer to 151 was $60,800. Ms. Disler also received a $1,000 overnight bonus, resulting in a total of $61,800. Garland, on the other hand, upon assuming that same position on September 1, 2002, received a salary of $60,400. Moreover, Garland did not receive the $1,000 overnight bonus which Ms. Disler received. While Ms. Disler underscores the fact that Garland's base pay before he left Store 151 was $61,600, that fact lends little to an analysis of this issue because Ms. Disler quit before she would have received her annual merit increase in March 2004.

Either way, Ms. Disler loses on this issue. If she compares her starting salary to Garland's starting salary, she was paid more, *i.e.*, her $60,800 to his $60,400. Moreover, if the court includes her $1,000 overnight bonus, which Garland did not receive, then she was paid $1,400 more than Garland. "Under the EPA, the term 'wage' generally includes all payments ... whether called wages, salary, profit ... [or] bonus ... ." 29 C.F.R. § 1620.10. Thus, Ms. Disler's bonus should be included when comparing her wages to that of Garland. When the court engages in that analysis, Ms. Disler has no cause of action under the EPA.

Moreover, the court is not persuaded by Ms. Disler's attempt to include a 2004 annual bonus in the calculation of Garland's salary which Garland received at a different Target store in April 2004, a month after Ms. Disler quit Target. Any

bonus comparison for what Garland received in April 2004 would require speculation between what Ms. Disler would have received for the subsequent fiscal year and what Garland actually received. Again, Ms. Disler quit a few weeks before the annual merit increases would have been awarded. Based on the record of Ms. Disler's past merit increases, it appears that her salary would have again topped Garland's. But again, this analysis totally misses the mark. The EPA requires only that this court compare Ms. Disler's salary to Garland's at the appropriate times. The court has done so and Ms. Disler has nothing whatsoever to complain about regarding her salary, at least from an EPA analysis. Ms. Disler's claims regarding unequal pay under the EPA or, for that matter, Title VII, must be dismissed.

C.

*FLSA Claims*

Ms. Disler's FLSA claim is based on her allegation that she was misclassified as an exempt employee when in fact she performed manual labor pushing freight as the ETL-Logistics at Store 151. Thus, Ms. Disler claims that she is due overtime compensation for the time she worked in that position.

Section 7(a) of the FLSA requires an employer to compensate an employee who works over 40 hours a week "at a rate not less than one and one-half

56

times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Section 13(a) of the FLSA, however, entirely exempts from the overtime pay requirement any employee who is employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1). This exemption is to be "narrowly construed against the employer seeking to assert [it]." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Michigan Ass'n of Governmental Employees v. Michigan Dept. of Corrections*, 992 F.2d 82, 83 (6th Cir. 1993). Application of the exemption is limited to those circumstances plainly and unmistakably within the exemption's terms and spirit. *Arnold*, 361 U.S. at 392. The employer bears the burden of proving that the exemption applies to the employee in question. *Michigan Ass'n of Governmental Employees*, 992 F.2d at 83.

Congress did not define the phrase "bona fide administrative capacity" in the FLSA, choosing instead to delegate that responsibility to the Secretary of Labor. *See* 29 U.S.C. § 213(a)(1). The Secretary's regulations provide a "short test" applicable to individuals who earn at least $250 per week to determine whether or not they are employed in a bona fide executive capacity. 29 C.F.R. § 541.[27] Because Ms. Disler earned considerably more than $250 per week, the short test definition applies in this case.

---

[27]If an employees earns less than $250 per week, the employer must meet a more rigorous "long test" in order to prove that the employee is exempt from § 7(a). *See* 29 C.F.R. § 541.2(e)(1).

The short test defines an individual employed in a bona fide executive capacity as an employee "whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees there ... ." 29 C.F.R. § 541.1(f). The regulations also provide guidance as to which duties are managerial in nature. According to 29 C.F.R. § 541.102(b),

> ... it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stored or sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

In addition, the regulations indicate how to determine whether the performance of managerial duties constitutes the employee's primary duty. 29 C.F.R. § 541.103 states:

58

The amount of time spent in the performance of managerial duties is a useful guide in determining whether management is the primary duty of the employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 per cent, of the employee's time ... . Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 per cent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with the other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

In *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 688-89 (6th Cir. 2001), the court observed as follows:

There is ample statutory and case law authority to support the magistrate judge's position that courts must focus on the actual activities of the employee in order to determine whether or not he is exempt from the FLSA's overtime regulations. 29 C.F.R. § 541.103, which describes primary duty, states that 'a determination of whether an employee has management as his primary duty must be based on all the facts in a particular case.' In addition, section 541.207(b), which describes the exercise of discretion and independent judgement, notes that 'the term must be applied in the light of all of the facts involved in the particular employment situation in which the question arises.' 29 C.F.R. § 541.207(b). Both of these DOL [Department of Labor] regulations indicate that the determination of whether an employee is exempt is an inquiry that is based on the particular facts of his employment and not general descriptions.

59

Here, Ms. Disler has introduced ample proof that management was not her "primary duty." According to her testimony, her primary duty was "pushing freight." Ms. Disler testifies in particular that she was pushing freight considerably more than 50% of the time, *i.e.*, "more than 95%." Furthermore, Ms. Disler has testified that many of the managerial and administrative functions which were ordinarily entrusted to the ETL-Logistics were actually being handled by the TLs or by Canada. While Target's job description of the ETL-Logistics position indicates that it easily meets the definition of an exempt position under the FLSA, Ms. Disler has presented sufficient proof to the contrary as to what that position actually entailed at 151. Thus, Ms. Disler has created a genuine issue of material fact on her FLSA claim which must be resolved by the jury, especially since this exemption is to be narrowly construed against Target.

## V.

### *Plaintiff's Motion for Sanctions for Spoliation of Evidence*

Because the court has determined that Ms. Disler's FLSA claim should be submitted to the jury, the court must turn next to Ms. Disler's motion for sanctions for spoliation of evidence related to that claim. More specifically, Ms. Disler seeks an appropriate sanction based upon the fact that Target destroyed the "monitoring"

60

videotapes after notice from her attorney on March 23, 2004, seeking all "surveillance videos taken by the company during Ms. Disler's work hours."  [*See* Doc. 44, App., Ex. 9].  Again, that request was made in the context of a letter which specifically advised Target that one of Ms. Disler's claims would be "misclassifying [Ms. Disler] as an exempt employee and failing to pay her overtime in violation of the [FLSA] ... ."  [*Id.*].

"Since the early 17th century, courts have admitted evidence tending to show that a party destroyed evidence relevant to the dispute being litigated." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3rd Cir. 1994) (citing Jamie S. Gorelick, Steven Marzen & Lawrence Solum, *Destruction of Evidence*, § 2.1 (1989)).  "Such evidence permitted an inference, the 'spoliation inference,' that the destroyed evidence would have been unfavorable to the position of the offending party." *Id.*

The Sixth Circuit has observed that the "policy rationales for this type of adverse inference are both evidentiary and deterrent."  *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988).  More specifically, the Sixth Circuit stated:

> The evidentiary rationale springs from the common sense notion that a party with notice of an item's possible relevance to litigation who proceeds nonetheless to destroy

61

it is more likely to have been threatened by the evidence than a party in the same position who does not destroy it:

> The fact of destruction satisfies the minimum requirement of relevance [under Fed.R.Evid. 401]: it has some tendency, however small, to make the existence of a fact at issue more probable than it otherwise would be ... . Precisely how the document might have aided the party's adversary, and what evidentiary shortfalls its destruction may be taken to redeem, will depend on the particular facts of each case.

[*Nation-Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.*,] 692 F.2d [214,] 218 [(1st Cir. 1982)].

> The second rationale acts to deter parties from pretrial spoliation of evidence and 'serves as a penalty, placing the risk of an erroneous judgment on the party that wrongfully created the risk.' *Id.*

The *Welsh* court further teaches that when considering the destruction of potentially relevant evidence, the court must consider the degree of fault of the party who altered or destroyed the evidence, "ranging from innocence through the degrees of negligence to intentionality." *Id. See also Schmid*, 13 F.3d at 79 (a key consideration is the degree of fault of the party who altered or destroyed the evidence). Additionally, although not mentioned by the *Welsh* court, some courts consider the degree of prejudice suffered by the imposing party. *See, e.g., Schmid*, 13 F.3d at 79; *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir. 1993).

62

Applying these principles to the instant case, the court readily concludes that attorney Bowman provided proper notice to Target to preserve the so-called "monitoring" videotapes. Attorney Bowman's request, in the court's view, was not the least bit ambiguous as Target now suggests by couching his request in terms of "surveillance videos" as opposed to "monitoring videotapes." The court agrees completely with Ms. Disler's position that her attorney requested in effect "all images captured by the 151 store security cameras without regard to their internal, unpublicized distinction." [Doc. 43, p.7]. This is especially true given the fact that Target's own employees do not fully comprehend this distinction, nor does Target's web site or any other posted documents highlight this dichotomy between these two types of videotapes to the public. At a minimum, attorney Bowman's letter should have prompted Target's in-house counsel to at least pick up the telephone and call him to determine the precise nature of his request. For Target to have destroyed the monitoring videotapes under these circumstances is simply inexcusable.

However, before imposing a sanction for the deliberate destruction of evidence, the court must also consider whether the destruction has prejudiced the opposing party. Here, Ms. Disler testifies that she was pushing freight at least "95% of the time." Target vigorously disputes that notion, contending that Ms. Disler spent most of her time in her office and that her employees could not ever locate her. Obviously, these "monitoring" videotapes might have supported Ms. Disler's

63

argument that she was pushing freight a considerable amount of the time, thereby leading to the conclusion that Target misclassified her as an exempt employee under the FLSA.

Of course, the court (and the jury) will never know what those videotapes would have depicted. In the court's opinion, this is a perfect case in which to utilize the "missing evidence" instruction. The jury will, of course, be allowed to consider Target's explanation regarding the destruction of these videotapes, relying on its purported distinction between "surveillance" videotapes and "monitoring" videotapes. The jury will probably be less impressed with this distinction than was the court. Nevertheless, this will be a matter that will be left within the sound discretion of the jury.[28]

─────────────

[28]At this juncture, the court anticipates instructing the jury along the following lines:

> You have heard testimony about videotapes which have not been produced. Counsel for Ms. Disler has argued that this evidence was in Target's control and would have proven facts material to the matter in controversy.

> If you find that Target could have produced these videotapes, and that the videotapes were within their control, and that these videotapes would have been material in deciding facts in dispute in this case, then you are permitted, but not required, to infer that this evidence would have been unfavorable to Target.

> In deciding whether to draw this inference, you should consider whether the videotapes not produced would merely have duplicated other evidence already before you. You may also consider whether Target had a reason for not producing these

Order accordingly.

_____*s/ James H.  Jarvis*_____
UNITED STATES DISTRICT JUDGE

_____

videotapes, which was explained to your satisfaction.  Again, whether or not to make this inference in Ms. Disler's favor against Target is solely a matter within the discretion of you, the jury.

*See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001).  This court will consider any further modifications to this proposed jury charge at the appropriate time.  *See* E.D.TN. LR 51.1.